**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**

|  |  |  |
|---|---|---|
| WILSON MERCADO, | ) | |
| | ) | |
| | ) | Civil Action No.: |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| vs. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

By and through the undersigned Counsel of Record and pursuant to the Federal Rules of Civil Procedure, Plaintiff WILSON MERCADO ("Plaintiff") files this Complaint for damages against Defendant UNITED STATES OF AMERICA ("Defendant") pursuant to § 804(b) of the "Honoring our PACT Act of 2022," also known as the "Camp Lejeune Justice Act of 2022" (hereinafter "the Act").

## THE PARTIES, JURISDICTION, AND VENUE

1. Plaintiff is a resident of Vero Beach Florida. Between August 1, 1953, and December 31, 1987, Plaintiff was a servicemember at Marine Corps Base Camp Lejeune, North Carolina ("Camp Lejeune") where he resided, worked, and was otherwise exposed to water that was supplied by, or on behalf of, the Defendant, for not less than thirty (30) days.

2. Defendant is the party responsible for the damages to Plaintiff alleged under the Act and caused and/or contributed to by its military service components, including but not limited to responsibility for the acts and omissions of the United States Navy ("Navy") and United States Marine Corps ("Marine Corps") and related facilities.

3.      Defendant has waived its sovereign immunity from suit under 28 U.S.C. § 2680(a) pursuant to § 804(f) of the Act.

4.      The United States District Court for the Eastern District of North Carolina has exclusive jurisdiction over any action filed under § 804(d) of the Act and is the exclusive venue for this action.

5.      This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1346(b)(1) and 1402(b).

## CONDITIONS PRECEDENT

6.      Pursuant to § 804(h) of the Act, an individual may not bring a claim under § 804 to obtain relief for harm that was caused by exposure to the water at Camp Lejeune before complying with 28 U.S.C. § 2675.

7.      Pursuant to 28 U.S.C. § 2675, an action shall not be instituted upon a claim against Defendant for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of Defendant, its employees, or agents, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

8.      At all relevant times, no statute, regulation, law, executive order, or other binding authority of any federal or state government has mandated a time for presentment of a claim pursuant to 28 U.S.C. § 2675 as a condition precedent for relief under § 804.

9.      At no time prior to the enactment of the Act has 28 U.S.C. § 2675 been modified, amended, or supplemented to mandate a time for presentment of a claim under § 804.

10.     Prior to the commencement of this action, Plaintiff presented his claim to obtain relief for harm that was caused by exposure to the water at Camp Lejeune to the appropriate federal agency and this claim was deemed denied pursuant to 28 U.S.C. § 2675.

2

11.     On or about September 16, 2014, Plaintiff presented his claim for relief for harm caused by exposure to contaminated water at Camp Lejeune to the Navy.

12.     On September 23, 2014, the Navy received Plaintiff's claim.

13.     On October 9, 2014, the Navy advised Plaintiff in writing that it received his claim and provided him with a date-stamped copy of the claim for verification of receipt.

14.     On January 24, 2019, the Navy denied Plaintiff's claim in writing sent by certified mail, return receipt requested.

15.     All conditions precedent to the filing of this action and to Plaintiff's right to the relief sought herein have occurred, have been performed, or have been excused.

## FACTUAL ALLEGATIONS

16.     Established in 1941, Camp Lejeune has long served as a major training facility for the Marine Corps.

17.     At all relevant times, Defendant constructed, maintained, inspected, owned, controlled, and/or operated the utilities, installations, housing, and other facilities located at Camp Lejeune (variously "the base"), including the water-supply wells, water testing equipment and protocols, related water equipment and the water distribution systems that provided drinking and bathing  water as well as potable water for other purposes to the base ("water systems").

18.     Historically, the drinking water at Camp Lejeune was extracted from over 100 groundwater wells that collected and pumped water to eight treatment plants for distribution to the servicemembers, their families, residents, civilian workers, and visitors at Camp Lejeune, together with any other persons reasonably expected to be using the base's water supply for personal use and/or consumption.

3

19.     The base barracks, workplaces, housing, and community facilities were served by three main water distribution systems, including: Hadnot Point (beginning in 1942); Tarawa Terrace (beginning in 1952); and Holcomb Boulevard (starting June 1972).

20.     At all relevant times, Defendant was responsible for providing the base with a potable water supply that was not contaminated and/or polluted and was otherwise safe for drinking, bathing, and all other foreseeable uses for the servicemembers, their families, residents, civilian workers, and visitors at Camp Lejeune, or any other persons whom Defendant could reasonably foresee to be using Camp Lejeune's potable water supply for personal use, contact, and/or consumption.

21.     At all relevant times, Defendant was responsible for constructing, maintaining, inspecting, operating and testing the water-supply wells and distribution systems, and otherwise ensuring that the property and installations it constructed, maintained, inspected, owned, controlled, and/or operated at Camp Lejeune did not contain dangerous and/or hazardous contaminants and/or pollutants that could and/or did contaminate and/or pollute Camp Lejeune's water systems.

22.     At all relevant times, Defendant was responsible for constructing, maintaining, inspecting, operating and testing the water and water systems at Camp Lejeune, and otherwise ensuring that the water and water related property's and installations it constructed, maintained, inspected, owned, controlled and/or operated at the base did not have dangerous and/or hazardous contaminants and/or pollutants that could cause serious personal injuries or death to persons who resided, worked, or otherwise were present at Camp Lejeune between August 1, 1953 and December 31, 1987.

23.     Defendant was advised by a series of experts and consultants with whom it had engaged as early as 1958 that Camp Lejeune's water systems were susceptible to contamination and would require frequent inspection.

24.     Nevertheless, despite repeated warnings, Defendant did not establish an inspection and repair protocol for its water systems until 1987.

25.     Defendant allowed pollutants and/or contaminants, including tetrachloroethylene (also known as perchloroethylene or "PCE"), trichloroethylene ("TCE"), 1,2 trans-dichloroethylene ("DCE"), vinyl chloride, and benzene, to contaminate Camp Lejeune's water systems in quantities that were dangerous to the health, life, and welfare of servicemembers, their families, residents, civilian workers, and visitors at the base.

26.     At all relevant times, Defendant provided water containing contaminants and/or pollutants, including PCE, TCE, DCE, vinyl chloride, and benzene, to the servicemembers, their families, residents, civilian workers, and visitors at Camp Lejeune, including Plaintiff.

27.     At all relevant times, Defendant knew or should have known that providing water containing contaminants and/or pollutants, including PCE, TCE, DECE, vinyl chloride, or benzene, regardless of the source, to servicemembers, their families, residents, civilian workers, and visitors at Camp Lejeune was dangerous and could cause individuals coming into contact with the water to develop severe diseases and injuries.

28.     At all relevant times, Defendant negligently provided water containing contaminants and/or pollutants, including PCE, TCE, DECE, vinyl chloride, or benzene, regardless of the source, to servicemembers, their families, residents, civilian workers, and visitors at Camp Lejeune resulting in individuals coming into contact with the water and developing severe diseases and injuries.

29. The aforesaid contaminants and/or pollutants, including PCE, TCE, DECE, vinyl chloride, and benzene, cause severe diseases and injuries, including, but not limited to: bladder cancer, bone cancer, breast cancer, cervical cancer, esophageal cancer, kidney cancer, leukemia, liver cancer, lung cancer, multiple myeloma, Non-Hodgkin lymphoma, prostate cancer, rectal cancer, renal toxicity, end-stage renal disease, Parkinson's disease, scleroderma, systemic sclerosis, choanal atresia, aplastic anemia and other myelodysplastic syndromes, hepatic steatosis (also known as fatty liver disease), eye defects, cardiac defects, neural tube defects, spina bifida, anencephaly, other birth defects of the brain, spine, or spinal cord, oral cleft defects, fetal death, low birth weight, miscarriage, female infertility, and death, to the servicemembers, their families, residents, civilian workers, and visitors at Camp Lejeune to whom Defendant provided water.

30. At all relevant times, Defendant had critical knowledge and information concerning the presence of contaminants and/or pollutants in Camp Lejeune's water systems, and the resulting health consequences to those who used the water, and failed to share this knowledge and information with servicemembers, their families, residents, civilian workers, and visitors at Camp Lejeune, including Plaintiff.

31. At all relevant times, Defendant had critical knowledge and information concerning the presence of contaminants and/or pollutants in Camp Lejeune's water systems, and the resulting health consequences to those who used the water, and negligently failed to share this knowledge and information with the servicemembers, their families, residents, civilian workers, and visitors at Camp Lejeune, including Plaintiff.

32. At all relevant times, Defendant had critical knowledge and information concerning the presence of contaminants and/or pollutants in Camp Lejeune's water systems, and the resulting

health consequences to those who used the water, and failed to share this knowledge and information with the authorities charged with monitoring the drinking water.

33.     At all relevant times, Defendant had critical knowledge and information concerning the presence of contaminants and/or pollutants in Camp Lejeune's water systems, and the resulting health consequences to those who used the water, and negligently failed to share this knowledge and information with the authorities charged with monitoring the drinking water.

34.     Beginning in the mid-1950s, toxic chemicals from various sources, including unlined landfills and leaking storage tanks, seeped into the soil and groundwater of Camp Lejeune and ultimately contaminated many of the wells used to supply water-treatment plants at the base.

35.     In or about 1958, Defendant engaged hydrogeologist, Harvey E. Legrand, to evaluate well water resources at Camp Lejeune. Legrand later reported that the wells at Hadnot Point, Tarawa Terrace, and Montford Point were built on thin shellrock, which could allow contaminants to penetrate into the aquifer and recommended frequent well inspections and repairs.

36.     In or about 1959, Camp Lejeune opened its first hazardous waste dump, but officials ignored it. Instead, waste, including industrial cleaning solvents, pesticides, battery acid, and gasoline, was regularly dumped in ditches or fields for burial and sometimes even directly above an aquifer.

37.     In or about August 1963, Defendant, through the Department of the Navy's Bureau of Medicine and Surgery (BUMED), issued Navmed P-5010-5, which contained guidelines for medical surveillance of public water systems at all Navy medical assets, including all Marine Corps public water systems, which included those at Camp Lejeune. The manual explicitly cited structural defects in Camp Lejeune's water systems as a health hazard that violated the standards for Defendant's own facilities.

7

38.     In or about 1974, Defendant, through the commanding general of Camp Lejeune, issued Base Order 5100.13b, which declared that organic solvents were hazardous and improper disposal could lead to drinking water contamination, and described safe disposal procedures for contaminants or hazardous waste.

39.     In 1974, Congress passed the Safe Drinking Water Act intending to ensure safe drinking water for the public.

40.     In or about 1978, during meetings at Camp Lejeune, North Carolina Division of Water Resources informed Defendant of the Safe Drinking Water Act requirement of daily testing for bacteria and chemicals in the base's water systems.

41.     In or about October 1978, Defendant, through the Naval Facilities Engineering Command (NavFacEngCom), detected coliform bacteria in the Courthouse Bay water system and attributed the finding to rapid increase in sewage and water discharge levels at the base.

42.     In or about 1979, a leak occurred at the Hadnot Point Fuel Farm, causing at least 20,000 gallons of fuel to be dumped as a result of a break in a fuel line. The base did not report the spill to the EPA or the State of North Carolina, and permitted the tank to continue leaking at a rate of approximately 1,500 gallons per month and adversely affect the water systems at the base. It was not until 1980 that this tank was reported to need major repairs, nor was timely notification given to any state authority.

43.     In or about 1979, Defendant, through the United States Environmental Protection Agency ("EPA"), promulgated regulations governing drinking water under the Safe Drinking Water Act of 1974, 42 U.S.C. §§ 300f *et seq.*  To comply with those regulations, Camp Lejeune's water utility began testing drinking water at the base.

44.     In or about 1979, Henry Von Oesen & Associates, an engineering firm engaged to review the water treatment facilities at Camp Lejeune, reported serious operating problems, including the inability to control water treatment properly, and recommended closing and demolishing the Tarawa Terrace and Montford Point water treatment plants.

45.     In or about November 1979, Defendant, through EPA, published a Suggested No Adverse Response Level ("SNARL")[1] for long-term exposure to TCE of *no more than 75 parts per billion* ("ppb").

46.     In or about April 1980, Defendant, through EPA, published a SNARL for long-term exposure to PCE of *no more than 20 ppb*.

47.     On or about October 21, 1980 the U.S. Army Environmental Hygiene Agency (USAEHA) began an analysis of total trihalomethanes (TTHM) in the water at Camp Lejeune revealing the presence of volatile organic compounds (VOCs) in the Hadnot Point water system.

48.     On or about October 31, 1980, USAEHA produced a TTHMA Surveillance Report indicating that finished water at Hadnot was "highly contaminated." The report was sent to Navy officials but no action was taken.

49.     In or about January 1981, USAEHA recommended an analysis for chlorinated organic compounds in the water at Camp Lejeune.

---

[1] "[SNARLs] are developed by EPA, the National Academy of Science, and other institutions as health-based guidance documents addressing the risks of carcinogenicity and other adverse health effects of particular substances in drinking water. Based on various risk assessment studies and techniques, SNARLs provide guidance concerning the quantity of a particular substance that may be ingested, inhaled, or otherwise absorbed by an individual from drinking water (based on length of exposure and body weight), without resulting in some form of adverse health effect." § 8:3. Introduction, 1 L. of Toxic Torts § 8:3 (2022).

50.     In or about February and March 1981, USAEHA ran additional tests and reported high levels of contaminants, including the presence of organic chemical contamination in water samples from Camp Lejeune.

51.     In or about April 1981, TCE, PCE and other contaminants were detected in water samples from the rifle range at Camp Lejeune.  Thereafter, the commander of the Atlantic Division of Naval Facilities Engineering Command notified Camp Lejeune's base commander of the contamination at the rifle range.

52.     On or about August 27, 1981, the Commanding General at Camp Lejeune, Major General Jerome G. Cooper, advised the North Carolina State Division of Health Services that Camp Lejeune's facilities met current drinking water standards, but did not disclose the results of prior testing that revealed high levels of contaminants and/or pollutants in the water systems.

53.     In or about March 1982, Defendant, through the Navy, hired an environmental consultant, Water & Air Research, Inc. of Gainesville, Florida, to conduct an Initial Assessment Study (IAS) of water at Camp Lejeune, which found that 22 of 76 well sites warranted further investigation due to suspected contamination.

54.     In or about April 1982, Grainger Laboratory, a contractor retained by Defendant to test water at Camp Lejeune,  reported an inability to test for trihalomethanes at Hadnot Point and Tarawa Terrace because organic solvents interfered with their readings, and began warning base officials that the wells serving those water systems were contaminated.

55.     In or about May 1982, the drinking water at Camp Lejeune was tested, and the levels of TCE in the Hadnot Point distribution system were as high as 1,400 ppb – far exceeding Defendant's SNARL of 75 ppb. Further testing at Hadnot Point on or after December 1984 also detected the presence of PCE, vinyl chloride and benzene.

56. In or about July 1982, testing of the Tarawa Terrace distribution system detected TCE levels of 104 ppb in the water supply—also exceeding Defendant's SNARL of 75 ppb.

57. On or about August 10, 1982, Grainger Laboratory reported to the base commander that the water well fields were the source of contamination. Grainger Laboratory further reported that there was no evidence that Defendant had conducted any prior water testing for contaminants other than bacteria.

58. On August 19, 1982, the supervisory chemist in the quality control lab at Camp Lejeune, Elizabeth A. Betz, acknowledged in an internal memo that PCE and TCE were present in the drinking water at Camp Lejeune; that TCE was used as a metal degreaser, pesticide, and fumigant; and that PCE readings may be due to asbestos coated pipes in the water system. Betz further noted that these compounds were harmful to humans, specifically causing liver, kidney, and central nervous system damage.

59. In or about early 1983, base officials failed to disclose water contamination in a report to EPA despite repeated warnings from Grainger Laboratory.

60. In or about June 1983, North Carolina environmental regulators requested water test results from the Marine Corps, with encouragement from Grainger Laboratory, but Marine Corps officials refused.

61. On or about July 6, 1984, an environmental consultant, Environmental Science and Engineering Inc., conducted tests at Hadnot Point, revealing benzene levels at 380 ppb in far excess of the EPA allowance.

62. In or about November 1984, the base closed Well 602 near Hadnot Point due to high benzene levels, and closed two additional wells in November and December 1984 as a result of high levels of TCE and other contaminants.

63.     In or about February 1985, testing of the water supply and distribution systems detected PCE levels as high as 215 ppb in the Tarawa Terrace distribution system; TCE levels as high as 1148 ppb and DCE levels as high as 406 ppb in the Berkeley Manor Elementary School area; and one water-supply well having TCE levels as high as 18,900 ppb, PCE levels of 400 ppb, DCE levels of 8,070 ppb, and vinyl chloride levels of 655 ppb.

64.     In addition to the Hadnot Point and Tarawa Terrace distribution systems, the Holcomb Boulevard distribution system was found to be intermittently contaminated by Hadnot Point water between 1972 and 1985, but even before 1972, the Holcomb Boulevard area was supplied with water from the Hadnot Point system.

65.     Ultimately, the base shut down ten wells due to contamination between November 1984 and February 1985.

66.     On or about May 15, 1985, the State of North Carolina notified Camp Lejeune's base commander about the presence of organic contaminants in 10 wells and called for an action plan and remediation.

67.     At all relevant times, Plaintiff was unable to mitigate his individual damages as a result of Defendant's refusal and failure to share its critical knowledge and information concerning the contaminants and/or pollutants in the water at Camp Lejeune, which Plaintiff had been exposed to, and the foreseeable health consequences resulting from use of the water, which Defendant could have prevented.

68.     The excessive level of contaminants and/or pollutants detected in Camp Lejeune's water systems exceeded Defendant's own guidance for safe drinking water and the legally enforceable maximum contaminant levels ("MCLs") established by EPA to regulate particular

substances in drinking water associated with risks of carcinogenicity and other adverse health effects.

69.    The current MCLs for PCE and TCE are 5 ppb, which came into effect in 1989 and 1992, respectively; the current MCL for DCE is 100 ppb, which came into effect in 1991; and the current MCLs for vinyl chloride and benzene are 2 ppb and 5 ppb, respectively, and both of which came into effect in 1989.

70.    Historical reconstruction modeling of drinking water contamination at Camp Lejeune indicates that since the 1950s, the water supply distribution systems contained PCE and TCE levels far above the current MCLs for these contaminants.

71.    On or about November 4, 1989, Camp Lejeune was placed on the EPA's National Priorities List ("NPL") and declared a federal "Superfund" site because of the hazardous, wide-spread, and high-level of contaminants and/or pollutants in the water systems at the base.

72.    By 1991, all groundwater contaminant investigations and remediation activities at Camp Lejeune were placed under the oversight of the Defendant's Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and the Resource Conservation and Recovery Act ("RCRA").

73.    Once placed on the NPL, the United States Agency for Toxic Substances and Disease Registry ("ATSDR") – a statutorily created agency and operating division within the Department of Health and Human Services – at the direction or request of Defendant's Department of Defense, became responsible for completing a Public Health Assessment ("PHA").

74.    In 1997, ATSDR completed and published a PHA for Camp Lejeune concluding that individuals who served, resided, or worked at Camp Lejeune had been exposed to contaminants of concern in the drinking water.

75. In or about October 2008, Defendant continued to conceal the truth behind the extensive contamination of drinking water at Camp Lejeune, reporting that the contamination was caused by a dry cleaner off-base, and failing to make any reference in an official televised report to the more significant contamination caused by chemicals on the base.

76. However, on May 7, 2009, ATSDR publicly announced on its website the *removal* of the 1997 PHA due to the emergence of additional information related to exposures of VOCs in the drinking water at Camp Lejeune that was known but not timely disclosed by the Defendant.

77. In December 2012, ATSDR released a new report, "Analyses and Historical Reconstruction of Groundwater Flow, Contaminant Fate and Transport, and Distribution of Drinking Water Within the Service Areas of the Hadnot Point and Holcomb Boulevard Water Treatment Plant and Vicinities, U.S. Marine Corps Base Camp Lejeune, North Carolina – Chapter D: Occurrence of Selected Contaminates in Groundwater at Above-Ground and Underground Storage Tank Sites," which discusses the presence of specific contaminants in groundwater at above-ground and underground storage tanks at Camp Lejeune during the estimated period of water contamination, from approximately 1953 to 1987.

78. ATSDR concluded in its report that during that timeframe, petroleum, oils, and lubricants ("POLs") — including gasoline, waste oil, diesel, heating oil, and jet fuel — were stored in unmonitored, single-walled, underground storage tanks, and over time, these underground storage tanks rusted and leaked, thereby contaminating surrounding groundwater.

79. ATSDR also revealed in this report that the water within the Hadnot Point water treatment plant service area was contaminated with PCE, TCE, and refined petroleum products, including benzene, toluene, ethylbenzene, and xylenes ("BTEX"), and that significant contamination occurred in the area of the former Hadnot Point Fuel Farm and Building 1115.

80.     Building 1115, a refueling facility, had seven underground tanks installed as early as 1943 (and dug up 50 years later) and was located only 300 feet from Hadnot Point Well 602. Maximum benzene concentrations in samples taken from monitor wells at the Hadnot Point Fuel Farm and Building 1115 reached 43,000 micrograms per liter, suggesting fuel contamination near the building as a likely source of contamination.

81.     The 2012 ATSDR Report summarized the newly discovered results of investigations at 64 designated RCRA study areas and emphasized the occurrence and distribution of BTEX components, such as benzene, within the groundwater of the areas served by the Hadnot Point and Holcomb Boulevard Water Treatment Plants.

82.     ATSDR subsequently completed five health studies between 2013 and 2015 concerning Camp Lejeune.

(i)     A 2013 study of whether *in utero* and infant exposures to contaminated drinking water were associated with birth defects suggested an association between drinking water contaminants and neural tube defects.

(ii)    A 2014 study found elevated risks for several cancers, including kidney cancer, rectal cancer, prostate cancer, lung cancer, leukemias, and multiple myeloma, when compared to similar unexposed cohorts from Marine Corps Base Camp Pendleton.

(iii)   A 2014 study found that civilians who worked at Camp Lejeune from 1973 to 1985 had elevated mortality hazard ratios for kidney cancer, leukemias, multiple myelomas, rectal cancer, oral cavity cancer, and Parkinson's disease.

(iv)    A 2014 study of mothers who lived at Camp Lejeune at the time of delivery suggested associations between TCE exposure and low birth weight and other birth issues.

It also found an association between PCE exposure and the risk of preterm birth and an association between benzene exposure and term low birth weight.

(v)      A 2015 study identified associations between exposure to PCE and other chemicals in the Camp Lejeune drinking water and male breast cancer.

83.      In January 2017, the ATSDR published a superseding PHA for Camp Lejeune.  The 2017 PHA reached a number of conclusions about the water systems at Camp Lejeune.

(i)      **Hadnot Point Water System –** The 2017 PHA concluded that "[r]esidents, workers, Marine and naval personnel, and Marines-in-training at MCB Camp Lejeune were in the past exposed to contaminants in drinking water supplied by the Hadnot Point [water treatment plant]."  It further concluded that "this contaminant exposure was at levels that could have harmed their health" and that "[t]he estimated levels to which all the above-mentioned groups of people were exposed could have resulted in an increased cancer risk and increased potential of experiencing adverse, noncancer health effects."  According to the ATSDR, "[t]richloroethylene (TCE) and vinyl chloride were the chemicals that contributed most to the increased cancer risk."

(ii)      **Tarawa Terrace Water System -** The 2017 PHA concluded that "the Tarawa Terrace [water treatment plant] might have harmed the health of young children," including through "an increased risk of cancer," and that "Marines living in the Tarawa Terrace area who were exposed to water from the Hadnot Point [water treatment plant] during training may have had a higher risk of health-related problems."

(iii)      **Holcomb Boulevard Water System -** The 2017 PHA concluded that prior to 1972, when the Holcomb Boulevard Water System was served by the Hadnot Point water

treatment plant, residents' exposure to contaminants "could have resulted in an increased cancer risk and increased potential of experiencing adverse, noncancer health effects."

(iv) **Lead exposure** - The 2017 Public Health Assessment concluded that "past exposure to lead found in tap water at 19 locations could have harmed people's health."

(v) **Other Exposures** - The 2017 PHA concluded that Marines and civilians who trained in indoor swimming pools in the Hadnot Point area between the early 1950s and 1985, as well as civilians who worked at laundry facilities, were exposed to contaminants at levels that might have harmed their health.

84. In 2017, ATSDR published its "Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases." As part of its mandate, ATSDR completed several epidemiological studies to determine if Marines Corps, Navy personnel, and civilians residing and working at Camp Lejeune were at increased risk for certain health effects as a result of exposure to water contaminated with VOCs.

85. The 2017 ATSDR report concluded that a causal relationship exists between the following diseases and the contaminants in the Camp Lejeune water supply or a causal relationship is at least as likely as not: bladder cancer, kidney cancer, leukemia, liver cancer, multiple myeloma, non-Hodgkin's lymphoma, Parkinson's disease; end-stage renal disease; systematic sclerosis/ scleroderma, and cardiac defects.

86. On August 10, 2022, the President of the United States of America, Joseph R. Biden, Jr., signed into law the Camp Lejeune Justice Act of 2022.

87. Section 804(b) of the Act establishes a new federal cause of action specifically for those affected by the extensive contamination at Camp Lejeune, providing that:

> An individual, including a veteran (as defined in section 101 of title 38, United States Code), or the legal representative of such an

individual, who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period beginning on August 1, 1953, and ending on December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States may bring an action in the United States District Court for the Eastern District of North Carolina to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune.

88.    The Act "appl[ies] only to a claim arising before the date of enactment of this Act." The statute requires that a claim must be presented to the relevant federal agency consistent with 28 U.S.C.§ 2675 before the judicial action may proceed. Section 804(h). Under that provision, if the federal agency fails to make a final disposition of such a claim within six months of its filing, the claim is "deemed" denied, allowing the claimant to file an action in court. 28 U.S.C. § 2675(a).

89.    The Act makes clear that a plaintiff may obtain a recovery for harm that was caused by exposure to the water at Camp Lejeune, including "latent disease." Section 804(c)(1).

90.    To meet the burden of proof under the Act, a plaintiff must only "produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is sufficient to conclude that a causal relationship exists; or, sufficient to conclude that a causal relationship is at least as likely as not." Section 804(c)(2).

91.    The Act also provides its own statute of limitations for claims seeking damages for harm that was caused by exposure to the water at Camp Lejeune and expressly rejects the application of any other statute of limitations or statute of repose. Section 804(j).

92.    The statute of limitations applicable to such claims provides that "[a] claim in an action under this section may not be commenced after the later of— the date that is 2 years after the date of enactment of this Act; or, the date that is 180 days after the date on which the claim is denied under section 2675 of title 28, United States Code." *Id.*

18

93.     Accordingly, under the foregoing provisions of the Act, Plaintiff asserts claims against Defendant to obtain appropriate relief for harm caused by exposure to the water at Camp Lejeune and reserves all further rights and remedies afforded under the Act.

## COUNT ONE: CAMP LEJEUNE JUSTICE ACT

94.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

95.     Plaintiff served in the Marines Corps and resided on base at Camp Lejeune for approximately two  years between 1973 and 1975.

96.     During this time, Plaintiff regularly consumed, utilized and was otherwise exposed to substantial amounts of water supplied by Defendant, or its agents, at Camp Lejeune.

97.     However, the water supplied to Plaintiff by Defendant for everyday purposes, including for drinking and bathing, was polluted and contaminated with chlorinated solvents and other contaminants including, but not limited to, TCE, PCE, DCE, vinyl chloride, and benzene.

98.     Subsequently, Plaintiff was diagnosed with non-Hodgkin's lymphoma in 2004 and has suffered related injuries.

99.     In accordance with the standards set forth in § 804(c)(2) of the Act, a causal relationship exists between Plaintiff's exposure to the water at Camp Lejeune and his diagnosis of multiple myeloma.

100.     The causal relationship between Plaintiff's exposure to water at Camp Lejeune and his diagnosis of non-Hodgkin's lymphoma is at least as likely as not.

101.     As such, Plaintiff's exposure to the contaminated water supplied by Defendant at Camp Lejeune was a direct and proximate cause of his non-Hodgkin's lymphoma and the damages as set forth below.

## DAMAGES

102. Plaintiff has suffered serious personal injuries and is entitled to damages for:

    (i)      Physical pain and suffering (past, present, and future);

    (ii)     Mental anguish, anxiety, depression, and suffering (past, present and future);

    (iii)    Loss of enjoyment of life and inconvenience (past, present, and future);

    (iv)    Medical and hospital expenses (past, present and future);

    (v)     Loss of earnings (past, present and future); and

    (vi)    Injuries and damages on such other particulars as the evidence may show.

## PRAYER FOR RELIEF

103. Plaintiff respectfully requests judgment against Defendant for all general damages, special damages, and pecuniary damages, together with interest, if applicable, and the costs of this action, and such other and further relief as this Honorable Court or a jury deem just and proper.

## JURY TRIAL DEMAND

104. Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and § 804 of the Act.

Dated: August 10, 2022

                             Respectfully submitted,

                             **HENSON & FUERST, P.A.**
                             */s/Thomas W. Henson, Jr.*
                             Thomas W. Henson Jr.
                             NC Bar No. 16669
                             Rachel A. Fuerst
                             NC Bar No. 28273
                             David S. Henson
                             NC Bar No. 25557
                             P.O. Box 7008

Rocky Mount, NC 27804
Tel: (919) 781-1107
Fax: (252) 443-9429
Email: thomashenson@lawmed.com
Email: rfuerst@lawmed.com
Email: dhenson@lawmed.com
Local Rule 83.1 Counsel

**WATTS GUERRA LLC**
*/s/Mikal Watts*
Mikal Watts (*special appearance*)
Texas State Bar No. 20981820
Meredith Drukker Stratigopoulos
Texas State Bar No. 24110406
Guy L. Watts
Texas State Bar No. 24005316
Shelly Sanford
Texas State Bar No. 00784904
5726 W. Hausman Dr., Suite 119
San Antonio, Texas 78249
Tel: (210) 447-0500
Fax: (210) 447-0501
Email: mcwatts@wattsguerra.com
Email: mdrukker@wattsguerra.com
Email: gwatts@wattsguerra.com
Email: ssanford@wattsguerra.com